UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ZLORO JOHNSON, *et al.,* | ) | Case No.: 1:05 CV 1094 |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| MIDLAND CREDIT MANAGEMENT | ) | |
| INCORPORATED, *et al.,* | ) | |
| | ) | |
| Defendants | ) | ORDER |

Now pending before the court are Plaintiffs Zloro Johnson ("Johnson") and Rod L. Feyedelem's ("Feyedelem") (together, "Plaintiffs") Objections (ECF No. 44) to Magistrate Judge David S. Perelman's denial (ECF No. 43) of Plaintiffs' Motion for Leave to File Second Amended Class Action Complaint (ECF No. 34), as well as Johnson's Motion for Partial Summary Judgment (ECF No. 61), and Plaintiff's Motions for: Class Certification (ECF No. 12); Amendment of the Case Management Conference Order (ECF No. 48); a Status Conference (ECF No. 53); and Leave to File a Sur-Reply Brief (ECF No. 78).  Also pending are Defendants Midland Credit Management, Inc. ("Midland"), and Encore Capital Group, Inc.'s ("Encore") (together, "Defendants") Motion for Summary Judgment (ECF No. 62), and Motion to Strike Plaintiffs' Alleged Damages, Or In the Alternative To Compel, And For Sanctions (ECF No. 54).

For the reasons stated below, Plaintiffs' Objections (ECF No. 44) are sustained in part and overruled in part, Johnson's Motion for Partial Summary Judgment (ECF No. 61) is granted in part and denied in part, Plaintiffs' Motion for Class Certification (ECF No. 12) is denied without prejudice, Plaintiffs' Motion to Amend Case Management Conference (ECF No. 48) is denied without prejudice, Plaintiffs' Motion for Status Conference (ECF No. 53) is granted, and Plaintiffs' Motion for Leave to File Sur-Reply (ECF No. 78) is granted.  Additionally, Defendants' Motion for Summary Judgment (ECF No. 62) is granted in part and denied in part, and Defendants' Motion to Strike (ECF No. 54) is denied as moot.

## I. OBJECTIONS TO THE MAGISTRATE JUDGE'S OPINION

### A. Facts and Procedural History

#### 1. Original and First Amended Complaints

On March 18, 2005, Johnson filed the above-captioned lawsuit against Midland, a consumer debt collection agency, and Encore[1], Midland's parent company, in the Erie County Court of Common Pleas, alleging violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692g, on behalf of himself and others similarly situated.  On April 29, 2005, Midland removed the case to this court on the basis of federal question jurisdiction.

In the original Complaint, Johnson alleged he had received a letter dated January 13, 2005, from Midland, a debt collection agency, inviting him to "say goodbye" to his debt of $522.06.  (Pl. Compl. ¶ 9, ECF No. 1.)  Johnson alleged that he never received a legally required "validation notice" from Midland, pursuant to 15 U.S.C. § 1692g, informing him of his right to dispute the

---

[1]  Plaintiffs seek to recover from Encore under the theory that Encore is Midland's alter ego.  Each of Plaintiffs' claims are against both Midland and Encore.

- 2 -

validity of the debt.  The original Complaint also named a proposed class of Plaintiffs who received

debt collection notices from Midland, a debt collection agency, and defined the class as:

> All persons and entities who received within the past year, identical or
> substantially similar  communications from Defendants, alleging a debt
> owed to a third party and seeking to collect that debt excluding employees,
> officers, directors, legal representatives, heirs, successors and assignees
> of Defendants.

(Pl. Compl. ¶ 15, ECF No. 1.)

Johnson filed a First Amended Complaint on May 25, 2005, adding Feyedelem as a named

plaintiff who had also received a similar debt collection notice from Midland which did not contain

the 15 U.S.C. § 1692g notice.  (Pl. 1st Am. Compl. ¶ 17, ECF No. 7.)

Plaintiff filed a motion for class certification (ECF No. 12) on July 27, 2005.  However, at

the request of the parties, the court postponed the full briefing and ruling on the class certification

motion.  (*See* ECF Nos. 15, 17, 20, 29, 32, 37.)

<u>2. Proposed Second Amended Complaint</u>

On December 8, 2005, Plaintiffs filed a Motion for Leave to File Second Amended Class

Action Complaint (ECF No. 34).  In the Second Amended Complaint, Plaintiffs sought to modify

the class definition of the previously-identified class, "Class A," and to add a second class, "Class

B."  The new Class A was to consist of those whose initial notification had been returned to the

Defendants as undeliverable, but who had subsequently received collection notices.  The new Class

B was to consist of those who received an initial notification and contacted the Defendants to dispute

the validity of their debt, but continued to receive collection notices after Defendants failed to

investigate their disputes.

- 3 -

The court referred the Motion for Leave to Amend to Magistrate Judge David S. Perelman for a ruling.  The Magistrate Judge issued a memorandum opinion and order on January 30, 2006, denying the motion for leave to file an amended complaint.  (ECF No. 43.)

In his memorandum opinion and order, Magistrate Judge Perelman ruled that the amended class definitions "completely change[] the nature and scope of the action."  (1/30/2006 Order at 2, ECF No. 43.)  He denied leave to amend the Class A definition on the basis of futility, finding that the Plaintiffs had not made a prima facie showing of a viable class with respect to commonality or numerosity.  The Magistrate Judge denied leave to amend the Class B definition on the grounds that Plaintiffs had unduly delayed in seeking leave to amend, and that such an amendment was also futile.

Plaintiff subsequently filed Objections to the Magistrate Judge's ruling.  (ECF No. 34.)

### B. Standard of Review

This court has jurisdiction to review a Magistrate Judge's order on a non-dispositive matter under Federal Rule of Civil Procedure 72(a), which states:

> The district judge to whom the case is assigned shall consider such objections and shall modify or set aside any portion of the magistrate judge's order found to be clearly erroneous or contrary to law.

### C. Amendment Standard

Federal Rule of Civil Procedure 15(a) provides that leave to amend "shall be freely given when justice so requires."  The Supreme Court has interpreted this provision to mean that "[i]n the absence of any apparent or declared reason – such as undue delay, bad faith, or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of

- 4 -

amendment, etc. – the leave sought should, as the rules require, be 'freely given.'" *Foman v . Davis*, 371 U.S. 178, 182 (1962).  Where a party seeks leave to amend under Rule 15(a), it "must act with due diligence if it intends to take advantage of the Rule's liberality."  *United States v. Midwest Suspension & Brake*, 49 F.3d 1197, 1202 (6th Cir. 1995).  Moreover, in denying a motion to amend, a court must find "at least some significant showing of prejudice to the opponent." *Moore v. City of Paducah*, 790 F.2d 557, 562 (6th Cir. 1986).

Federal Rule of Civil Procedure 16(b) requires the district court to set a scheduling order limiting the time parties may have to amend the pleadings, and states that the "schedule shall not be modified except upon a showing of good cause and by leave of the district judge."  In evaluating a motion for leave to amend after the expiration of the amendment deadline in the scheduling order, a court is also required to consider the potential prejudice to the defendant.  *E.g., Leary v. Daeschner*, 349 F.3d 888, 909 (6th Cir. 2003).

### D. Amendments Regarding Johnson and Class A

With respect to the amendments proposed by Johnson, the Magistrate Judge concluded that "insofar as the proposed second amended complaint is intended to assert a claim for relief on behalf of plaintiff Johnson individually . . . it could be permissible."  (1/30/2006 Order at 8, ECF No. 43.) However, he found that Plaintiff had not made a prima facie showing that the *class* was viable, noting that:

> When the defendants' representatives were deposed in October the subject of how returned mail was followed up was, to some extent, gone into. From that testimony it appears to this Court that there was no uniform policy or practice. This would bear heavily on the issue of commonality.
>
> What was not gone into with them was the question of the volume of returned mail during the relevant one year period. This leaves wide open the

> issue of numerosity, which plaintiff must demonstrate in support of the vehicle of class action.
>
> Plaintiff has presented nothing to substantiate the contention that [identifying the class] could readily be done "using Defendants' customer lists, computer files, and other information kept by Defendants in the usual course of business" and, unlike the plaintiff, this Court is not willing to speculate that this is so.

(*Id.* at 9.)

The court overrules this determination by the Magistrate Judge.  The court finds that the amendment does not fundamentally alter this lawsuit.  When Plaintiffs filed their case, they knew they had received collection notices without first receiving any information about their right to dispute the debt.  They did not know if it was the Defendants' practice never to send such letters, or if the Defendants regularly sent such letters but failed to send them to the Plaintiffs on this occasion, or if the Defendants previously sent letters to Plaintiffs which were never received.  It was only through discovery that Plaintiffs learned that Defendants had sent a validation notice letter, but the Post Office had returned it as undeliverable.  Thus, Johnson now seeks to narrow the Complaint to cover only those debtors whose original validation notice letters from the Defendants were returned as undeliverable.  As such, he is narrowing the scope of his claim.  The legal basis for the claim – a violation of 15 U.S.C. § 1692g – is unchanged from the original complaint.  Plaintiff has thus shown good cause for the amendment.

The court further finds it would be improper to deny Plaintiff's amendment at this time on the ground that a class claim is futile. First, there have been ongoing discovery disputes in this case; the Magistrate's Order addressed a number of these when it granted in part and denied in part Plaintiff's motion to compel. The court finds it would not be appropriate to conclude that Plaintiff

cannot make a prima facie showing of commonality and numerosity when Plaintiff is still awaiting responses to some initial discovery matters.  Second, the court finds Plaintiff has minimally established a prima facie showing necessary to permit this amendment.  Plaintiff's assertion of numerosity is not based solely on the fact that the volume of Defendants' mail is high; it is also based on the age of the debt purchased by Defendants, the resulting likelihood of returned mail, and the fact that the class can be specifically identified from Defendants' database.  *Cf. Smith v. Transworld Systems, Inc.,* 953 F.2d 1025, 1032 (6th Cir. 1992) (affirming denial of leave to amend class action complaint for failure to satisfy class action prerequisites where allegations are solely based on inferences from the fact that defendant debt collection agency's records are computerized).  Additionally, while the Magistrate Judge concluded that it appeared from deposition testimony that Defendants had no uniform policy or practice with respect to returned mail, the court finds this would tend to support commonality.  If, as Plaintiff alleges, Defendants' policy on returned mail is to ignore it and continue to send collection notices,  it would create common questions of law and fact for each class member.

It is not clear to the court that Plaintiff will be able to meet the requirements for class certification absent additional, specific information from Defendants' database as to the numerosity of this class, as well as additional information on Defendants' policy or lack thereof with respect to returned mail.  However, in light of the fact that the amendment is based on recently obtained information, the court will permit Johnson to amend his Complaint, and rule substantively on the merits of the proposed class when they are fully briefed in the context of the class certification motion.

- 7 -

The court also notes that the sole basis for the Magistrate Judge's denial of leave to amend Class A was futility.  The Magistrate Judge did not conclude, as suggested by Defendants, that Plaintiffs had unduly delayed in seeking the Class A amendment.  Therefore, as the court cannot conclude at this time that amendment would be futile, and Defendants have not demonstrated substantial prejudice, the court grants Plaintiff leave to amend his Complaint with respect to Class A.

### E. Amendments Regarding Feyedelem and Class B

In denying the Plaintiffs leave to amend their Complaint to add a new class, Class B, the Magistrate Judge cited both undue delay and futility.  With respect to the undue delay, the Magistrate held:

> The plaintiffs were certainly aware of their contacts with defendants representatives when the initial complaint was filed on April 4, 2005 and when the first amended complaint was filed almost two months later, yet they did not come forward with this theory of unlawful conduct until December 8, 2005. It is disingenuous to suggest that this eight month gap is attributable to newly discovered evidence, as plaintiffs now appear to assert.

> As no reasonable explanation is offered to account for failing to advance this claim in a timely manner, this Court finds that the failure to do so warrants denial of amendment to advance it at this time.

(1/30/2006 Order at 7, ECF No. 43.)  Plaintiffs, in their Objections to the Magistrate Judge's Order, argue that:

> it was not until Plaintiff Feyedelem was in receipt of Defendants' internal records of his account, recording Midland Credit's collection activities, that it became apparent that Defendants were documenting his protestations as a 'verbal dispute', but no further action was taken by Defendants to investigate or find some evidence of the debt's validity.

- 8 -

(Pls. Obj. 6, ECF No. 44.) The court is not persuaded by Plaintiffs' arguments. The essential facts behind this claim were within the Plaintiffs' knowledge at the time they filed this lawsuit. At that time, they knew of Feyedelem's conversations with Defendants in which he disputed his debt, and knew he had continued to receive collection notices. However, the original and first amended complaints do not mention that Feyedelem took any actions to dispute his debt with Defendants. If Plaintiffs had wished to define a class accordingly, it should have or could have done so when it filed its original complaint, or within the time permitted by the court for amendments. The Plaintiffs have not shown why it was necessary to wait until learning that Defendants kept records of debtors who disputed their debts before filing the amendment. Unlike the Class A amendments, the Class B amendments do change the nature of the lawsuit and would add a completely new claim and class over a year after the lawsuit was commenced, and several months after the amendment deadline. The question of whether Defendants resolve disputes over debts properly presents different legal and factual issues than the notice of rights question raised by Class A. Plaintiffs have unduly delayed in adding this claim, and have not shown the requisite good cause under Rules 15 and 16 to merit leave to amend.

Since the court finds there has been undue delay, it is not necessary for the court to address the Magistrate Judge's conclusion that such an amendment would also be futile.

Accordingly, Plaintiffs' Objections (ECF No. 44) are sustained in part and overruled in part. Plaintiffs are granted leave to amend their Complaint to add the factual allegations and clarification of the proposed Class A. However, Plaintiffs are denied leave to add the proposed Class B to their Complaint.

## II. CROSS-MOTIONS FOR SUMMARY JUDGMENT

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) governs summary judgment motions and provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law . . . .

Rule 56(e) specifies the materials properly submitted in connection with a motion for summary judgment:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the  matters stated therein . . . .  The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits.  When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denial of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

However, the movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

In reviewing summary judgment motions, this court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943-44 (6th Cir. 1990).  A fact is "material" only if its resolution will affect the outcome

- 10 -

of the lawsuit.  *Anderson v. Liberty Lobby, Inc.*,  477 U.S. 242, 248 (1986).  Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict."  *Id.* at 252.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.  *Celotex*, 477 U.S. at 322.  Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact."  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)).  The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material fact.  *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts.  *Id.*

When faced with a motion for class certification and a motion for summary judgment, a district court may grant summary judgment prior to determining class certification.  *E.g., Miami Univ. Wrestling Club v. Miami Univ.,* 302 F.3d 608, 616 (6th Cir. 2002)

### B. Facts

#### 1. Johnson's Debt and Notices from Midland

Approximately 20 years ago, Johnson purchased a watch from Osterman Jewelers, which subsequently malfunctioned within a year of purchase. (Johnson Dep. at 27, 29, ECF No. 63, Ex.

1.)  Johnson informed Osterman Jewelers he would not finish making payments on the watch.  (*Id.* at 27-29.)  True to his word, Johnson made no further payments, and Defendants purchased the debt on November 10, 2004.  (*Id.*; Rita Melconian Dep. at 71-72, ECF No. 63, Ex. 6.)

On or about November 14, 2004, Midland[2] sent a letter to Johnson at 1330 Harrison Street in Sandusky Ohio.  (*See* Midland Computer Records, ECF No. 63, Ex. 5.)  The letter's text was based on the Midland form letter "LTA1."  (*Id.*)  It is undisputed that LTA1 contains the debt validation language required by the FDCPA.  (Lisa Steen Dep. at 20-21, ECF No. 63, Ex. 9.)  However, Midland's records indicate that on December 6, 2004, the Post Office returned the letter to Midland as undeliverable.  (*Id.* at 38; Midland Computer Records, ECF No. 63, Ex. 5.)  Johnson has not lived at the Harrison Street address for at least five years.  (Johnson Dep. 4-5, ECF No. 61, Ex. 2.)  Midland's computer database notes that the LTA1 was "Undeliverable to 1330 Harrison St." (Midland Computer Records, ECF No. 63, Ex. 5.)  The Midland database "turned off" the Harrison Street address the same day, with the code "RTM" – returned mail.  (Steen Dep. 31, ECF No. 63, Ex. 9.)

On January 13, 2005, Midland sent another letter to Johnson, addressed to 528 W. Perkins Avenue.  (Midland Computer Records, ECF No. 63, Ex. 5.)  This letter, based on the Midland form letter NY50, sought payment of the debt, but did not contain the FDCPA validation notice.  (Pl. 1st Am. Compl., Ex. A, ECF No. 7.)  Johnson received the NY50 letter.

---

[2]    The letter was actually sent by PSC Info Group, Inc., the third-party firm Midland uses to process and mail its validation letters.  The court discusses this practice in greater detail below in Section III.B.3, *supra*.

On March 3, 2005, Midland sent another letter to Johnson at the 528 W. Perkins Avenue address.  (Midland Computer Records, ECF No. 63, Ex. 5.)  This letter was also returned as undeliverable, and on April 1, 2005, the 528 W. Perkins Avenue address was "turned off" in Midland's computer database.  (*Id.*)  Further collection efforts ceased with the filing of this lawsuit.

### 2. Feyedelem's Debt and Notices from Midland

In 1992, Feyedelem opened a charge account at Sears, and at some point thereafter, failed to make a payment on the account.  (Feyedelem Admis., ECF No. 63, Ex. 8.)  Midland purchased the debt on November 1, 2004.

On January 18, 2005, Midland sent an LT1A letter to Feyedelem.  (Midland Computer Records, ECF No. 63, Ex. 7.)  Feyedelem's First Amended Complaint indicates he never received the initial letter; however, there is no evidence in the record on summary judgment that the letter was returned as undeliverable.  On March 11, 2005, Midland sent a follow-up letter to Feyedelem, which did not contain the FDCPA notice.  (Pls. 1st Am. Compl., Ex. B, ECF No. 7.)  The next day, Feyedelem called the number on the letter to find out more information about the debt he allegedly owed.  (Feyedelem Dep. 17-18, ECF No. 63, Ex. 2.)  He attempted to contact Sears directly, but was routed back to Midland.  (*Id.* at 19-20.)  He contends he disputed his debt, but Midland did nothing about it.  (*Id.* at 20-22.)  Further collection efforts ceased with the filing of this lawsuit.

### 3. Midland's Computer Database System

When Midland purchases debts, the information for the purchased accounts is loaded into Midland's sophisticated computer database.  (Brian L. Frary Dep. 28-29, ECF No. 61, Ex. 1.)  Using a "Smart Letter Program," the computer makes the decision to send an FDCPA-compliant validation letter to each new account if the data shows that a validation letter has not previously been sent.

- 13 -

(Melconian Dep. 38-39, ECF No. 63, Ex. 6.)  All validation letters are system generated through this automated program.  (Steen Dep. 15, ECF No. 63, Ex. 9.)  Midland keeps electronic records of all the actions taken on each account, including the sending of letters, but does not keep hard copies of each letter it sends. (*Id.* at 28-29; Frary Dep. 34-37, ECF No. 61, Ex. 1.)

Midland uses third party mail vendors to print and mail its collection letters.  (*Id.* at 8.)  PSC Info. Group sends all of Midland's initial debt validation notices.  (*Id.* at 10.)  Midland electronically transmits the account records and all the information needed to send letters to PSC. (Michael Hennessy Dep. 6-7, ECF No. 61, Ex. 7.)  PSC runs the data through "postal cleansing software" to identify incomplete addresses, and sends those accounts back to Midland.  (*Id.* at 12-13; Steen Dep. 12, ECF No. 63, Ex. 9.)  PSC then prints and mails letters for the complete addresses.

Midland receives notices from the Post Office when its mail is undeliverable or has a bad address.  (Steen Dep. 16-17, ECF No. 63, Ex. 9.)  Such notification may be for multiple reasons. For example, during the first twelve months of mail forwarding, the Post Office will forward mail to the recipient's new address and provide the sender with a separate notice of the new address. U.S. Postal Service Domestic Mail Manual Exh. 507.1.5.1.  For the next six months, the Post Office will return the mail to the sender with the new address noted.  *Id.*  After that, the mail is simply returned to the sender with no notice of new address.  The Post Office sends Midland both electronic data and "actual returned mail pieces to convey this information."  (*Id.* at 17-18.) Midland employees process that information and input it into the computer database system, which "turns off" bad addresses. (*Id.*)         However,  the  coding in the computer system does not

differentiate between separate new address notices for mail that was actually forwarded and mail

that was physically returned and never delivered:

> Q. Is there any way for you to tell in your computer system whether a letter was returned in the mail as undeliverable?
>
> A: No. We can tell if we've turned off the address, but that doesn't necessarily mean that the mail piece was returned to us.
>
> Q: Is there any database or any field that would track that information?
>
> A: No.  This [computer printout] that we already looked at would tell you if we were notified that the address was not a good one.  But sometimes the post office can still forward on the piece and would notify us that that one was not a good one.  So there's no way of knowing for certain if we got the piece back or if we were just notified that that wasn't a good address.

(*Id.* at 35.)

Midland's "Smart Letter Program," which initiates validation letters, does not have a protocol

for re-sending validation letters which were returned to Midland as undeliverable.  (*See* Midland

Smart Letter Process, ECF No. 61, Ex. 8.)  Once an address has been turned off in the database,

there is no mechanism in the computer database to send another validation letter.  (Steen Dep. 31-

32, ECF No. 63, Ex. 9.)

### 4. Encore

Encore is a publicly-held holding company and parent corporation for five wholly-owned

subsidiaries, including Midland.  (Frary Dep. 14-15, ECF No. 61, Ex. 1.)  Midland is the only

operating company of the Encore subsidiaries.  (*Id.* at 46.)  Encore conducts no business on its own,

and has no employees.  (*Id.* at 14-15.)  Midland does not produce its own public financial reports

or tax returns; its financials are reported by Encore along with the financials of Encore's other

subsidiaries.  (Frary Dep. 44-45, ECF No. 61, Ex. 1.)  As Midland is the only operating company

- 15 -

among Encore, its affiliates, and subsidiaries, Midland's finance department prepares financials on behalf of Encore. (*Id.* at 46.)

The executive officers on the boards of Encore and Midland are identical.  (*Id.* at 22-25; Midland's Resp. to Pls. First Set of Interrog. 5, ECF No. 61, Ex. 12; Encore's Resp. to Pls. First Set of Interrog. 5, ECF No. 61, Ex. 11.)  However, Encore's Board of Directors and Midland's Board of Directors are somewhat different.  (Frary Dep. 22-24, ECF No. 61, Ex. 1.) The CEO and President of Encore, J. Brandon Black, is also the CEO and President of Midland.  Midland's collection letters are sent out under Black's signature.

All correspondence Johnson and Feyedelem received regarding their debt was from Midland, not Encore.  (Feyedelem Dep. at 25, ECF No. 63, Ex. 2; Johnson Dep. at 56-57, ECF No. 63, Ex. 1.)

### C. Plaintiff's Partial Motion for Summary Judgment

Plaintiff Johnson now moves for summary judgment on his claim for violation of the FDCPA, arguing that because Midland knew he had not received the first validation notice, Defendants violated the FDCPA when Midland continued its debt collection activities without first notifying him of his right to protest the debt.

Defendants oppose Plaintiff's motion for summary judgment on the grounds that: (1) it would be a due process violation to grant Plaintiff's motion because it seeks relief for a claim not properly presented in the First Amended Complaint; (2) as a matter of law, the FDCPA only obligates a debt collector to *send* a validation notice, and does not require the notice be received; (3) even if it did violate the FDCPA, the bona fide error defense applies; and (4) Encore is not a debt collector under the FDCPA, and thus not a proper defendant.

- 16 -

### 1. Amendment Issue

Defendants contend the claim Johnson raises in his motion for summary judgment - that the Defendants knew his validation notice had not been properly addressed, but continued debt collection activities anyway - was not properly pled in the Complaint.  Summary judgment may not be considered, much less granted, on a claim or defense that has never been pled.  *See, e.g., Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1291-92 (9th Cir. 2000).  However, it is also true that "plaintiffs don't have to file long complaints, don't have to plead facts, [and] don't have to plead legal theories." *Kirksey v. R.J. Reynolds Tobacco Co.*, 168 F.3d 1039, 1041 (7th Cir. 1999).  In this case, as discussed in Section I.D, *infra*, Plaintiffs' First Amended Complaint is sufficiently broad enough to encompass the allegation that they were not given requisite notice because the initial notice was returned as undeliverable.  In that regard, it was not necessary that they file a Second Amended Complaint to raise this issue.  The allegedly "new" claim does not fundamentally alter the lawsuit.  Rather, it sets forth facts learned during discovery in support of Plaintiffs' legal claim.  Thus, the court may consider Plaintiff's Motion for Summary Judgment on its First Amended Complaint.     Defendants assertion that considering Johnson's motion at this time would violate due process is undermined by several facts.  First, although Defendants state generally in their opposition brief that they "have not conducted discovery on the precise issue raised in Johnson's motion," Defs. Opp. Br. 9, ECF No. 75, Defendants have not filed a Rule 56(f) affidavit indicating the specific discovery sought or required.  Under the rule:

> Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Fed. R. Civ. P. 56(f).  As Defendants have not filed such an affidavit, Rule 56(f) is not a bar to considering the motion for summary judgment.  Moreover, Defendants have extensively briefed the *precise issue* they now assert they need discovery on.  Defendants' opposition to Johnson's motion for partial summary judgment, as well as Defendants' own motion for summary judgment, address Johnson's claim directly.  It is not apparent to the court what additional discovery would be necessary, given the thorough discussion of the issues in Defendants' briefs.  Additionally, Johnson has conducted discovery related to the specific fact allegations he raises in the Second Amended Complaint.  Defendants were on notice, through Johnson's discovery of the "new" claim they now complain of.  Accordingly, the court does not see any due process clause barriers to ruling on the pending motion.

## 2. Liability Under the Fair Debt Collection Practices Act

Congress passed the FDCPA because existing laws did not adequately address "the use of abusive, deceptive, and unfair debt collection practices by many debt collectors."   15 U.S.C. § 1692(a).  The stated purpose of the FDCPA is "to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses."  15 U.S.C. § 1692(e).

The FDCPA generally controls how debt collectors must interact with debtors.  With respect to initial validation notices, the law states:

(a) Notice of debt; contents. Within five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall, unless the following information is contained in the initial communication or the consumer has paid the debt, send the consumer a written notice containing–

(1) the amount of the debt;
(2) the name of the creditor to whom the debt is owed;
(3) a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector;
(4) a statement that if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector; and
(5) a statement that, upon the consumer's written request within the thirty-day period, the debt collector will provide the consumer with the name and address of the original creditor, if different from the current creditor.

15 U.S.C. § 1692g(a).

There are two main lines of case law interpreting § 1692g.  The first, and more voluminous, line of case law relates to the actual *contents* of the validation notice, and typically addresses whether certain language complies with the statute.  *See, e.g., Smith v. Computer Credit, Inc.*, 167 F.3d 1052 (6th Cir. 1999).  In this area, the Sixth Circuit requires that the contents of the written notice "effectively convey" notice using a "least sophisticated debtor" standard.  *Id.* at 1054.

The second line of cases relates to the debt collector's obligation, or lack thereof, to ensure that debtors actually *receive* § 1692g notice.  *See, e.g., Mahon v. Credit Bureau of Placer County*, 171 F.3d 1197 (9th Cir. 1999); *Zamos II v. Asset Acceptance, LLC*, 423 F.Supp.2d 777 (N.D. Ohio 2006); *Van Westrienen v. Americontinental Collection Corp.*, 94 F.Supp.2d 1087 (D. Ore. 2000). In each of these cases, the debtors claimed to have never received § 1692g notice from the debt

collector, and in each case, the debt collector produced evidence they had sent the proper notice. *Mahon*, 171 F.3d at 1199; *Zamos II*, 423 F.Supp.2d at 785; *Van Westrienen,* 94 F.Supp.2d at 1097. Each court rejected the notion that it was the debt collector's obligation to ensure the debtor had received the notice, and the *Mahon* court held that "section 1692g(a) requires only that a Notice be 'sent' by a debt collector.  A debt collector need not establish actual receipt by the debtor."  171 F.3d at 1201; *see also Zamos II*, 423 F.Supp.2d at 785-86 (quoting and relying on *Mahon*); *Van Westrienen,* 94 F.Supp.2d at 1097-98 (same).  The *Mahon* court went on to reject the debtor's argument that the term "communication" in the statute "is the operative word, and requires an interactive exchange of some kind between the collector and the debtor," holding:

> The Mahons' argument misconstrues the section's use of "communication."
> Section 1692g(a) uses communication as a noun rather than as a verb. The
> FDCPA defines communication as "the conveying of information regarding
> a debt directly or indirectly to any person through any medium." 15 U.S.C.
> § 1692a(2). Thus, in section 1692g(a), the word "communication" functions
> solely as a vehicle of information, whereas the word "sent" operates as the
> active verb identifying the requisite action.
>
> The language of 15 U.S.C. § 1692g(a) is plain. Because the language of the
> statute is plain, we need not consider extrinsic sources to interpret its
> meaning. *See Pressley v. Capital Credit & Collection Serv., Inc.,* 760 F.2d
> 922, 924 (9th Cir.1985). The plain language of section 1692g(a) does not
> require that a Validation of Debt Notice must be received by a debtor.
> Instead, the plain language states that such a Notice need only be sent to a
> debtor.

171 F.3d at 1201.

However, the *Mahon* case left open the possibility of a different result if the original notice had been returned to the debt collector as undeliverable.  *See id.* at 1202.  The court noted that under the common law Mailbox Rule, "proper and timely mailing of a document raises a rebuttable presumption that it is received by the addressee."  *Id.* (internal quotations omitted).  The court went

on to find there was no evidence on the record to prove the original notice was returned as undeliverable, but noted:

> deposition testimony and the Credit Bureau's business practice established that no letters sent to the Mahons by the Credit Bureau were returned as undeliverable. Moreover, even if letters subsequent to the [original] September 21, 1995 Notice had been returned, without any evidence that the September 21, 1995 Notice was returned, the inference would be that it was not returned. This would tend to establish its receipt by the Mahons, apart from the common law Mailbox Rule presumption; and, in any event, that presumption is not rebutted by the absence of proof that the September 21, 1995 Notice was returned to the Credit Bureau.

*Id.* Thus, the court indicated the Mailbox Rule presumption was rebuttable, and that there might have been a different result if the original notice had been returned as undeliverable.

Notably, neither *Mahon,* nor *Zamos II,* nor *Van Westrienen*, involved any evidence or notion that an original validation notice had been returned to the debt collector as undeliverable.[3] The parties have cited no case in which a court was presented with the question of whether § 1692g obligates debt collectors to re-send validation notices if the original notice was returned as undeliverable, and thus, never received. Thus, the issue appears to be one of first impression.

The plain language of the FDCPA requires debt collectors to "send the consumer a written notice . . ." 15 U.S.C. § 1692g(a). If such notice is sent to an address where the consumer actually lives, this is obviously sufficient to meet the statutory requirements. However, when a written

---

[3]     Defendants repeatedly suggest in their briefs that in *Mahon*, the original notice may have been returned as undeliverable. (*See* Defs. Reply Br. 4, ECF No. 76; Defs. Br. in Opp. to Pls. Mot. for Leave to File Sur-Reply 2-4, ECF No. 79.) However, as the *Mahon* court stated, the evidence established "that no letters sent to the Mahons by the Credit Bureau were returned as undeliverable." 171 F.3d at 1202. Thus, Defendants' interpretation of *Mahon* is directly contradicted by the facts of the opinion.

notice is returned as undeliverable, it has not actually been *sent* to the *consumer*. Rather, it has been *sent* to an *improper address* for the consumer. Thus, while the plain language of the statute does not require the debt collector to ensure actual receipt of the validation notice, the plain language does require the debt collector to send the validation notice to a valid and proper address where the consumer may actually receive it. If the debt collector knows the validation notice was sent to the wrong address, the debt collector has not complied with the plain language of the statute.

Any contrary interpretation would defeat the stated purpose of the FDCPA, as well as the requirements of § 1692g(a). If debt collectors could satisfy the FDCPA by merely sending validation notices to *any* address, valid or invalid, it would not serve to inform debtors of their rights, and would constitute an "abusive debt collection practice." 15 U.S.C. § 1692(e). Section 1692g exists to inform debtors of their right to dispute a debt and to "eliminate the recurring problem of debt collectors dunning the wrong person or attempting to collect debts which the consumer has already paid." *Van Westrienen*, 94 F.Supp.2d at 1096 (internal quotations omitted). If debt collectors were not obligated to send a follow-up validation notice after the first was returned as undeliverable, it would defeat the purpose of § 1692g, because debtors would have no notice of their right to dispute a debt. This is contrary to both the purpose and plain meaning of the FDCPA.

This conclusion is entirely consistent with *Mahon*, *Zamos II*, and *Van Westrienen.* As the *Mahon* court noted, when a debt collector sends a validation notice, there is a presumption of delivery. Absent evidence to rebut the presumption, a debt collector has satisfied the notice requirements of the FDCPA. However, where the debtor rebuts the presumption of delivery by showing the notice was sent to an incorrect address and returned as undeliverable, the plain language and purpose of the FDCPA requires additional action by the debt collector to send a notice

- 22 -

reasonably calculated to reach the consumer.  This additional obligation only applies when the debt collector is aware the first notice was not delivered, e.g., when the actual notice is returned to the debt collector by the Post Office.  The obligation does not apply where the actual notice is forwarded on, and the debt collector gets a postcard notice of a new address.  Moreover, as in *Mahon*, *Zamos II*, and *Van Westrienen*, it does not apply where the Post Office does not return the notice, even if the debtor asserts he did not receive notice.

In the instant case, Midland's computer records indicate the validation notice it sent to Johnson was returned as undeliverable.  However, based on the design of Midland's computer system, this could mean the mail was actually physically returned, or it could mean the mail was forwarded and the Post Office notified Midland of an address change.  In this case, Johnson testified he had not lived at the Harrison Street address to which Midland sent the notice for more than five years.  Therefore, according to the Post Office guidelines, the mail could not have been forwarded. While Midland has shown evidence that it did send a validation notice, Johnson has rebutted the presumption of delivery.  Thus, the burden shifts to Midland to show that its notice to Johnson was not returned in the mail, since Midland receives returned mail from the Post Office in the regular course of business.  The mere fact that Midland's computer system was not designed to properly record the difference between returned mail and mail forwarding postcards is not sufficient to defeat summary judgment.  Midland has put forth no evidence to suggest it actually sent Johnson a validation notice at a valid address.  Midland's violation in this case resulted when it obtained a new address for Johnson, and instead of sending out a new validation notice, it proceeded with its debt collection activities as if its first correspondence was sent to a correct address.  Accordingly, since Midland failed to send Johnson a validation notice within five days of the first correspondence it

actually sent to a valid address, the January 13, 2005 NY50 letter, Midland violated the FDCPA, 15 U.S.C. § 1692g(a).

### 3. Bona Fide Error Defense

The FDCPA provides debt collectors with a complete defense if they show "by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." 15 U.S.C. § 1692k(c). Thus, to qualify for the defense, a debt collector must prove that: (1) the violation was unintentional; (2) the violation was a result of a bona fide error; and (3) the debt collector maintained procedures reasonably adapted to avoid any such error. *See, e.g., Lewis v. ACB Bus. Servs., Inc.* 135 F.3d 389, 402 (6th Cir. 1998).

The court finds the bona fide error defense inapplicable because Midland did not maintain procedures reasonably adapted to avoid any such error. Midland admits it receives returned mail from the Post Office, but does not record this information in its database any differently than it does when it receives mail address forwarding postcards. Midland has not programmed its computer system to record this data or act on it. Thus, as Midland admits, the computer database does not generate new validation letters in such circumstances. In essence, Midland *disregards* information that its validation letters are not being received. Midland's procedures are *not* adapted to avoid the error which occurred with Johnson. The fact Midland does take steps to avoid sending out mail to incomplete addresses does not negate the fact Midland has no process in place to record when mail is returned as undeliverable and no process to send out a new validation notice to a different address. Although the FDCPA "does not require debt collectors to take every conceivable precaution to avoid errors," *Kort v. Diversified Collection Services.*, 394 F.3d 530, 539 (7th Cir.

- 24 -

2005), Midland failed to take reasonable precautions in the instant case. This is sufficient to nullify the bona fide error defense.

Defendants' citations to *Lewis* and *Smith v. Transworld Systems, Inc.,* 953 F.2d 1025 (6th Cir 1992) are unavailing. In *Lewis*, the error was inadvertent, and the court found that "computer systems were 'reasonably adapted' to avoid the error that occurred in this case and in fact were able to catch the error in a very short period of time." 135 F.3d at 401. In the instant case, the computer system is not reasonably adapted; it did not and could not have caught the error as currently configured. In *Smith*, the court found procedures reasonably adapted to avoid the error on the basis of "an employee's procedural manual and two employee affidavits, which showed that the error was at most a clerical error." *Lewis,* 135 F.3d at 401 (discussing *Smith*, 953 F.2d at 1031.) In this case, there was no clerical error; to the contrary, there was a systematic error in Midland's procedures. The bona fide error defense is inapplicable, and Johnson's motion for summary judgment against Midland is granted.

### 4. Encore's Liability

Johnson argues Encore is a debt collector and thus should be liable, along with Midland, for violating the FDCPA. Encore contends it is not a debt collector under the FDCPA and that there are no grounds for piercing the corporate veil and holding it liable for the acts of its subsidiary.

Under the FDCPA, a "debt collector" may "directly or indirectly" collect debt. 15 U.S.C. § 1692a(6). Johnson concedes Encore did not directly contact him to collect on the debt, and instead argues that Encore is an indirect debt collector. To prove Encore is an indirect debt collector which may be held liable for the acts of its debt collection subsidiary, Johnson must pierce the corporate veil. *See Crawford v. Equifax Payment Servs.*, 1998 WL 704050, *10 (N.D. Ill. Sept. 30,

- 25 -

1998) (holding that where "two corporate entities are involved, only one of which directly attempted to collect the alleged debt, the plaintiff must allege facts sufficient if proved to pierce the corporate veil to prevail"); *Jenkins v. Union Corp.*, 999 F.Supp. 1120 (N.D. Ill. 1998); *Harrison v. NBD, Inc.*, 968 F.Supp. 837 (E.D.N.Y. 1997); *Stepney v. Outsourcing Solutions,* 1997 WL 722972 (N.D. Ill. Nov. 13, 1997).  In other words, "[a] parent corporation will not be liable for the [FDCPA] violations committed by its subsidiary absent special circumstances that the corporations should be deemed a single economic enterprise." *Harrison*, 968 F.Supp. at 845.  Courts only pierce the corporate veil "in extraordinary circumstances." *Backuswalcott v. Common Ground Community HDFC, Inc.,* 104 F. Supp. 2d 363, 369 (S.D.N.Y. 2000).

Johnson argues that Encore and Midland are a single economic enterprise.  In support, he cites that Encore: holds itself out to the investing public as a debt collection company; reaps substantial financial gains from Midland's collection activities; has no employees; has the same executive officers as Midland; maintains exclusive control over Midland's finances; shares facilities, computer systems, and financial operations with Midland; and operates Midland as a wholly-owned subsidiary.  However, for the reasons stated below, Plaintiffs have not met their burden of showing there are no genuine issues of material fact, and has not demonstrated that Encore and Midland are a single economic enterprise as a matter of law.

In evaluating whether two companies are a single economic enterprise, courts should consider factors such as "inadequate capitalization, absence of independent activity, action in the interest of the parent rather than the subsidiary, and failure to observe the legal requirements of separate corporate existence." *Stepney*, 1997 WL 722972 at *3; *see also Jenkins*, 999 F.Supp. at 1144.  In the instant case, Plaintiffs have not put forth any evidence on the relative capitalization

of Encore and Midland, and has not shown that Midland and Encore failed to observe the legal requirements of separate corporate existence.  While there is some evidence Encore does not engage in any independent activity, Johnson has not demonstrated that Encore and Midland both operate in the interest of Encore only, at the expense of Midland.  These genuine issues of material fact preclude a finding of summary judgment.

Moreover, when courts have found enough interdependence to grant a plaintiff's motion for summary judgment and find a parent and subsidiary are single economic enterprises, the facts have been much stronger than those on the record in this case.  *See, e.g., United States v. ACB Sales & Service, Inc.,* 590 F. Supp. 561, 575 (D. Ariz. 1984).  In *ACB Sales & Service*, the court noted the following facts in support of its conclusion that the parent company could be liable under the FDCPA for the acts of its subsidiary:

> The ACB Companies are clearly one economic enterprise engaged in the business of debt collections on a nationwide scale. This fact is established both by the ACB Companies' appearance to the public and the actual interdependent relationship between them. The letterhead and logo of each ACB company indicates that it is "an ACB collection agency." The ACB Companies refer to ACB Sales & Service and ACB Management Services as the "home office" and to the local ACB agencies as "branches." The ACB Companies are managed by an interlocking directorate consisting of Middleman, Schwartz, and Raker. ACB Sales & Service solicits clients and depends upon ACB Management Services and the local ACB agencies to fulfill its commitment to collect debts on behalf of the client. ACB Management Services provides vital support services to the local ACB Agencies. Specifically, ACB Management Services prepared the form letters that violated the Order and the FDCPA and issued directives, in the form of "branch operations" memoranda, to the local ACB companies concerning compliance with the Order and the FDCPA. Only the local ACB agencies perform debt collection services involving direct contact with a debtor, but they do so through the support and at the direction of ACB Sales & Service and ACB Management Services.

*Id.* at 574-75.  In the instant case, there is no evidence that Midland's letterhead and logo indicate it is an Encore company; to the contrary, the collection letters received by Plaintiffs do not contain any reference to Encore.  There is no suggestion of a branch/home office relationship between the two; however, there is little evidence at all as to the actual day-to-day working relationship between Encore and Midland.  While the executive officers are identical, the composition of the boards of Encore and Midland do not completely overlap.  Furthermore, courts have found, where interlocking directorates exist, that "[t]his commonplace circumstance of modern business does not furnish such proof of control as will permit a court to pierce the corporate veil."  *American Protein Corp. v. AB Volvo*, 844 F.2d 56, 60 (2d Cir. 1988).   Moreover, Plaintiffs have not produced evidence regarding whether Encore provides 'vital support services' to Midland or the extent to which it treats Midland as a branch operation.  While Plaintiffs have put forth evidence that Encore's subsidiaries exist solely to purchase debt which Midland then collects, Plaintiff has not put forth evidence on the extent to which Encore controls Midland's day-to-day operations and policies.  Thus, Plaintiff has produced little evidence as to many of the factors *ACB Sales & Service* considered in reaching its conclusion.  Therefore, based on the record before the court, *ACB Sales & Service* does not support a finding as a matter of law that Encore and Midland are a singular economic enterprise.

Johnson cites a number of cases for the proposition that "shareholders, officers or employees of a corporation that are personally involved in the debt collection may be held liable as debt collectors without piercing the corporate veil."  (Pl. Opp. to Defs. Mot. for Summ. J. 12, ECF No. 74.)  However, these cases are factually inapposite, since the Complaint does not name any *individual* shareholders, officers or employees.  Even if the court were to consider Encore, as Midland's parent company, an individual shareholder, there is nothing on the record suggesting

- 28 -

Encore was personally involved in the debt collection. Encore's name did not appear on the debt collection notices, and Johnson admitted he had never heard of Encore. Thus, these cases are not persuasive.

The court finds there are genuine issues of material fact which prevent the court from granting Johnson's motion for summary judgment and finding that Encore, as a matter of law, is an indirect debt collector. *See Moore v. Nat'l Account Systems, Inc.*, 1991 WL 313896, *2 (D. Conn. Nov. 13, 1991) (denying plaintiff debtor's motion for summary judgment and finding the issue of a parent company's dominance "poses a genuine issue of fact and is not proper for disposition on a motion for summary judgment.") Johnson has not established sufficient facts in the record to support a finding that Encore is an indirect debt collector as a matter of law. Johnson's Motion for Summary Judgment against Encore is therefore denied.

### D. Defendants' Motion for Summary Judgment

The court has already addressed much of the factual information pertinent to Defendants' motion for summary judgment in the context of addressing Johnson's motion for summary judgment. In concluding that Plaintiff was entitled to summary judgment against Midland on Plaintiff's FDCPA claims, the court also finds that Midland's motion for summary judgment on its FDCPA liability must be declined. Midland has not met its burden of showing both that there are no material issues of fact and that judgment should be entered in its favor as a matter of law.

Three parts of Defendants' motion remain for the court to address: (1) Encore's motion for summary judgment on its liability; (2) the claims of the other named Plaintiff, Feyedelem; and (3) the availability of injunctive and declaratory relief.

<u>1. Encore's Motion for Summary Judgment</u>

The court previously denied Johnson's motion for summary judgment as to Encore's liability, finding that Plaintiff did not meet his burden of showing he was entitled to judgment as a matter of law against Encore.  For the reasons stated below, there are genuine issues of material fact precluding the court from granting Encore's motion for summary judgment.

First, in cases where courts have granted a defendant parent corporation's motion for summary judgment on this issue, there was far less evidence of interdependence than in the instant case.

In *Jenkins*, the parties filed cross-motions for summary judgment on the question of the parent corporation's FDCPA liability as an indirect debt collector. 999 F.Supp. at 1142.  The court denied the debtor plaintiff's motion and granted the parent corporation's motion, noting that:

> Union plays no role in either the actual debt collection process or in procuring creditor-clients. The Union name does not appear on any Transworld correspondence. The two corporations do not share any facilities, employees or a computer system. One Transworld officer sits on Union's board and one Union director is a Transworld officer. Both corporations maintain their own accounting departments and keep separate corporate minutes. Although the bulk of Union's profits come from Transworld dividends, this amount is set after Transworld determines its immediate and long-range cash requirements.

*Id.* at 1143.  Based on these facts, the *Jenkins* court concluded that "Plaintiffs fall far short of establishing the facts necessary to find that Union and Transworld are engaged in a single economic enterprise, a finding required to make Union an indirect debt collector under the FDCPA." 999 F. Supp. at 1143.  In the instant case, there is a suggestion that Encore and its subsidiaries do play a role in procuring creditor-clients and/or purchasing debt.  Additionally, there is a suggestion the two corporations share facilities, employees, and a computer system.  As noted, there is substantial

- 30 -

board and officer overlap, and the corporations do not maintain separate accounting departments. Thus, the facts suggesting Encore and Midland are a single economic enterprise are far stronger than in *Jenkins*.

Similarly, the plaintiff debtor in *Crawford* sued two debt collectors, ECS and EPS, which were both subsidiaries of Equifax.  1998 WL 704050 at *1.  The plaintiff had received his debt collection notice from ECS, but alleged in his complaint that EPS controlled and operated ECS.  *Id.* EPS moved for summary judgment, and the court granted the motion, noting that the only record evidence of contact between the two subsidiaries was that EPS lawyers reviewed general language in ECS's form debt collection notices for legal sufficiency.  *Id.* at *8-*9.  The court found this insufficient evidence to support a finding that ECS and EPS were a single economic enterprise.  *Id.* at *10-*11.  In the instant case, there is far more evidence supporting a finding of a single economic enterprise than the occasional legal consultation deemed insufficient to support such a finding in *Crawford*.

Second, the other cases Encore cites in support of its motion are either inapposite or factually indistinguishable.

In *Stepney*, the plaintiff sued a parent company and its wholly-owned subsidiary under the FDCPA, arguing there was a single economic enterprise because the parent company had a financial interest in the debt collection activities of its subsidiary, approved the policies and practices of its subsidiary, and reported the subsidiary's revenue on its own financial statements.  1997 WL 722972 at *1.  The court, in considering the parent company's motion to dismiss, found these allegations in the complaint insufficient to establish the parent and its subsidiary were a single economic enterprise.  In this case, on summary judgment, Plaintiffs have presented evidence which is far more

suggestive of a single economic enterprise. As indicated above, Plaintiffs have produced evidence that: Midland is controlled by the same officers as Encore; Midland is the only operating company owned by Encore; Encore and its other subsidiaries exist solely to purchase debt for Midland to collect; and Encore and Midland share facilities, computer systems, and accounting and financial departments. This goes far beyond the unsupported allegations in *Stepney*.

Encore also cites *Scally v. Hilco Receivables, LLC*, 392 F. Supp. 2d 1036, 1037-42 (N.D. Ill. 2005) for the proposition that "a debt-purchaser that merely outsources the activity of debt collection to another entity is not deemed a debt-collector under the FDCPA." (Def. Reply Br. 12, ECF No. 76.) While this statement is true, the two defendants in *Scally* were two *completely* unrelated companies, with no parent, subsidiary, or affiliate relationship. Thus, *Scally* did not apply the veil piercing analysis, and it is inapposite. *Id.* at 1038 n.3. Encore's discussion of *Lewis v. ACB Business Services*, 135 F.3d 369, 407-10 (6th Cir. 1998) is similarly distinguishable, because the debtor plaintiff in that case sued both his creditor and a wholly unrelated debt collector to whom the creditor sold the debt. Thus, *Lewis* also did not apply a veil piercing analysis.

Encore has not established the absence of any genuine issues of material fact. In light of this, Encore cannot show it is entitled to judgment as a matter of law. Accordingly, Encore's motion for summary judgment is denied.

<u>2. Motion for Summary Judgment with respect to Feyedelem</u>

Despite Defendants' clear intent to pursue summary judgment against both named Plaintiffs in their motion, Plaintiffs elected not to make any arguments on behalf of Feyedelem in their briefing:

> Discovery has shown that the situation of Rod Feyedelem, also named as a plaintiff in the First Amended Class Action Complaint, is factually distinct from that of Plaintiff Johnson, as to this claim. Recognizing this, Plaintiffs sought leave to file a Second Amended Class Action Complaint. Plaintiffs' Motion for Leave to file this amended pleading was denied by the Magistrate, and is now before the court for a reconsideration of that decision. Therefore, Plaintiffs address Plaintiff Johnson's claims against Defendants for their violations of § 1692g of the FDCPA on behalf of himself and those individuals similarly situated.

(Pls. Br. in Opp. to Defs. Mot. for Summ. J. 4 n.1, ECF No. 74.)  However, in Section I.E, *infra*, the court rejected Plaintiffs' motion for reconsideration with regard to Feyedelem.  Accordingly, the court will examine Defendants' motion for summary judgment as to the claims Feyedelem pled in the First Amended Complaint.

Feyedelem's factual circumstances differ substantially from Johnson's.  As with Johnson, Midland's records show that it sent Feyedelem an initial validation notice.  However, unlike Johnson, there is no evidence or reason to believe Midland sent Feyedelem's notice to a bad address or that the Post Office returned Feyedelem's notice as undeliverable.  In such circumstances, Midland meets the requirements of § 1692g merely by *sending* the validation notice to Feyedelem. *E.g., Mahon*, 171 F.3d at 1201; *Zamos II*, 423 F.Supp.2d at 785-86; *Van Westrienen,* 94 F.Supp.2d at 1097-98.  Plaintiff Feyedelem has not cited to any fact which rebuts the presumption of delivery.  Accordingly, Defendants did not violate § 1692g of the FDCPA with respect to Feyedelem, and their motion for summary judgment is granted as to him.

### 3. Availability of Injunctive and Declaratory Relief

- 33 -

Defendants argue they are entitled to summary judgment as to Plaintiffs' request for declaratory and injunctive relief, because the FDCPA does not permit injunctive or declaratory relief.  The civil damages section of the FDCPA provides for actual damages and statutory damages not to exceed $1,000 per plaintiff.  15 U.S.C. § 1692k(a).  In class actions, the statute provides for the same actual and statutory damages for named class representatives, a lump sum for the remainder of the class, attorneys' fees and costs.  *Id.* at § 1692k(a)(2)(B).  The statute does not explicitly provide for injunctive or declaratory relief.  Most courts which have addressed the issue have held "injunctive and declaratory relief are not available to litigants acting in an individual capacity under the FDCPA."  *See, e.g., Weiss v. Regal Collections,* 385 F.3d 337, 342 (3d Cir. 2004).  However, multiple courts, including courts within this Circuit, have allowed declaratory relief for class action plaintiffs under the FDCPA.  *E.g., Mann v. Acclaim Fin. Servs.,* 232 F.R.D. 278, 285-86 (S.D. Ohio 2003); *Gradisher v. Check Enforcement Unit, Inc.,* 203 F.R.D. 271, 280 (W.D. Mich. 2001); *Gammon v. GC Servs. Ltd. Partnership*, 162 F.R.D. 313, 319 (N.D. Ill. 1995); *Woodard v. Online Information Servs.*, 191 F.R.D. 502, 507 (E.D.N.C. 2000).

Plaintiffs have cited no case in which a court has permitted injunctive relief to an individual plaintiff under the FDCPA, and the statute does not explicitly provide for injunctive relief.  Thus, this court finds they are not entitled to injunctive relief, and Defendants' motion for summary judgment is granted as to this issue.  Moreover, the court finds that as an individual plaintiff, Johnson is not entitled to declaratory relief.  However, the court will consider the availability of declaratory relief to the putative class when evaluating whether or not a class should be certified.

### IV. OTHER PENDING MOTIONS

### A. Defendants' Motion to Strike Plaintiffs' Alleged Damages

- 34 -

Shortly before the parties filed their cross-motions for summary judgment, Defendants filed a Motion to Strike Plaintiffs' Alleged Damages, or in the Alternative to Compel, and for Sanctions. In their Motion, Defendants contend Plaintiffs failed to provide Rule 26 disclosures pertaining to the computation of their actual damages, and urge the court to preclude any claims for actual damages as a sanction.  In response, Plaintiffs argue they are primarily seeking injunctive and declaratory relief, and statutory damages.  (Pls. Br. in Opp. to Defs. Mot. to Strike 2, ECF No. 56.) Moreover, Plaintiffs concede that "neither named Plaintiff has suffered actual damages based solely on the non-receipt of this letter," and any claim for actual damages rests on the "second cause of action pled in this [second] amended complaint [which] deals with the conduct of Defendants and their communications with Plaintiffs in their debt-collection process."  (*Id.*)  Since the court affirmed the Magistrate Judge's refusal to grant leave to amend and add the second cause of action to the Second Amended Complaint, *see* Section II.D, *infra*, the named Plaintiffs have no claims left for actual damages.  Moreover, one of the named Plaintiffs, Feyedelem, is no longer a party to the case, as the court granted summary judgment against him.  Accordingly, there are no remaining claims for actual damages, and Defendants' motion to strike plaintiff's alleged actual damages is denied as moot.

Defendants also seek to be paid for their expenses in bringing this motion, based upon Plaintiffs' failure to disclose the basis for their actual damages pursuant to Rule 26 and Plaintiffs' subsequent refusal to admit during discovery that they had no actual damages.  The court finds the awarding of attorneys fees or expenses is not warranted in light of the information provided by Plaintiffs and because there were still ongoing discussions between the parties regarding the

provision of additional information on damages.  Accordingly, the court denies Defendants' motion for expenses.

**B. Plaintiffs' Motion for Status Conference and In Camera Review of Documents**

Plaintiffs contend Defendants have not fully complied with Magistrate Perelman's discovery rulings, and seek to have the court examine certain documents *in camera* to determine whether or not they should be turned over.  Defendants deny any failure to comply with discovery, but indicate they are willing to submit the documents in question for *in camera* review.  The court agrees to review *in camera* documents submitted by Defendants.  However, prior to accepting any documents, the court will hold a telephonic discovery and status conference with the parties to determine the precise contours of the dispute.

Plaintiffs' Motion is hereby granted, on these conditions.

**C. Plaintiffs' Motion for Class Certification**

In light of the court's Orders permitting Plaintiffs to partially amend their complaint and granting partial summary judgment to Johnson, it appears the July 27, 2005 motion for class certification does not fully address the current facts and issues remaining in the case.  Accordingly, the court denies Plaintiffs' motion without prejudice to refiling.  The court will set a new schedule for briefing on class certification during a telephonic status conference.

**D. Plaintiffs' Motion to Amend Case Management Order**

Prior to filing their motions for summary judgment, the parties filed lengthy briefs disputing whether or not the case management order should be amended to extend the discovery period.  In light of the court's Order on the summary judgment motions, the court will discuss potential amendments to the case management schedule at a telephonic status conference.  The parties shall

- 36 -

confer prior to the conference and attempt to agree on a modified case management schedule, if the parties determine any modification is necessary.  Plaintiffs' motion is denied, without prejudice to refiling.

## V. CONCLUSION

For the reasons discussed above, Plaintiffs' Objections (ECF No. 44) are sustained in part and overruled in part, Plaintiffs' Motion for Partial Summary Judgment (ECF No. 61) is granted in part and denied in part, Plaintiffs' Motion for Class Certification (ECF No. 12) is denied without prejudice, Plaintiffs' Motion to Amend Case Management Conference (ECF No. 48) is denied without prejudice, Plaintiffs' Motion for Status Conference (ECF No. 53) is granted, and Plaintiffs' Motion for Leave to File Sur-Reply (ECF No. 78) is granted.  Additionally, Defendants' Motion for Summary Judgment (ECF No. 62) is granted in part and denied in part, and Defendants' Motion to Strike (ECF No. 54) is denied as moot.

The court will hold a telephonic status and discovery conference on September 6, 2006 at 4:00 p.m., to discuss any remaining discovery disputes and amend the case management schedule, if necessary.

IT IS SO ORDERED.

/s/ SOLOMON OLIVER, JR.
UNITED STATES DISTRICT JUDGE

August 23, 2006